Filed 10/6/15  P. v. Collins CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEROME G. COLLINS,<br><br>    Defendant and Appellant. | H040380<br>(Santa Clara County<br> Super. Ct. No. C1230868) |

Defendant Jerome G. Collins admits he had videos depicting child pornography on his computer, but he contends he downloaded the videos without realizing they were child pornography and did not know they were in his possession.  Accordingly, he says, he lacked the requisite knowledge to be convicted of possessing child pornography in violation of Penal Code section 311.11, subdivision (a).[1]  A jury rejected that argument and convicted defendant of possession of child pornography.  The trial court suspended imposition of sentence and placed defendant on three years' probation.  On appeal, defendant challenges two evidentiary rulings, five probation conditions, and an order requiring him to pay attorney fees.  Because certain of defendant's probation conditions are unconstitutional, we order those conditions modified or stricken.  We also order the trial court to vacate its attorney fee order and remand for further hearing on defendant's ability to pay attorney fees.

---

[1] Unspecified statutory references are to the Penal Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Santa Clara County District Attorney filed an information charging defendant with one count of possession of child pornography (§ 311.11, subd. (a)) on September 6, 2012. The following evidence was adduced at defendant's trial in the fall of 2013.

San Jose Police Officer Sean Pierce testified that he uses a law enforcement Web site to identify individuals in the San Jose area who possess child pornography. On that Web site, Pierce searches for computers in the area that have files containing commonly used child pornography search terms in their shared folders. On September 26, 2011, one such search indicated that a computer associated with a particular Internet protocol (IP) address contained six files associated with child pornography search terms. After confirming that one of the files in fact contained child pornography, Pierce obtained and served a search warrant on Comcast, the Internet service provider associated with the IP address. Comcast identified defendant as the subscriber for the IP address and provided Pierce with his name and home address.

On March 7, 2012, officers searched defendant's home pursuant to a search warrant. The residence was a three-bedroom mobile home defendant shared with his mother and two brothers. In defendant's bedroom, officers found a laptop containing child pornography, which they seized along with two external hard drives.

Defendant was not home at the time, so Officer Pierce and an arrest team went to defendant's place of employment. Officers phoned defendant and asked him to come outside without informing him why they were there. When defendant complied, Pierce handcuffed him and led him into an undercover police minivan. Pierce interviewed defendant after reading him his *Miranda*[2] rights. A recording of the 45-minute-long interview was played at trial.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

A transcript of that interview shows defendant told Officer Pierce he used the peer-to-peer network BearShare to download pornography. Pierce informed defendant "we're here for the child pornography" and asked defendant how often he downloaded it. Defendant responded "I don't think I do" and stated that he does not seek out child pornography and that he is not interested in young girls. When Pierce asked defendant about a particular child pornography video officers found on his computer, which features a naked girl with a mask on, defendant acknowledged downloading the video from BearShare. The parties refer to that video, which is a commonly traded child pornography video, as "the Tara video"; we shall do the same.

Defendant told Officer Pierce the girl in the video appeared to be 12 or 13 years old and that the video was "sad." Defendant said he had watched the Tara video "[m]ore than once." Pierce then asked, "are we talkin' a half-dozen times, are we talkin' a dozen times?" Defendant responded "Um . . . right now, I'd say about half a dozen times, maybe."

Defendant told Officer Pierce he had heard of the search terms "PTHC," "Hussyfan," and "R@ygold,"--terms Pierce testified are associated with child pornography--but that he did not know what they meant or had not used them in a long time. Defendant said that, instead, he regularly searched "rape fantasy" and, because he likes women with small breasts, terms such as "18," "girls," and "tiny tits."

Chris Hardin, a computer forensic examiner employed by the San Jose Police Department, testified as an expert in the examination of computers and other digital storage devices for child pornography. Hardin examined the hard drive from defendant's laptop and defendant's external hard drive. Hardin found approximately 13 videos containing child pornography on defendant's hard drives. Two of those videos were found on the external hard drive. Three of the videos Hardin found were introduced into

3

evidence and a 20-second clip of one of the videos--the Tara video--was played for the jury.[3] Hardin testified that the Tara video depicted a nine-year-old girl being sexually assaulted by an adult male. Thirteen still images from 11 of the videos Hardin testified constituted child pornography were admitted into evidence and published to the jury. Many of the video file names included the term "PTHC," which Hardin testified stands for "preteen hard-core." Many also referenced the age of the victim, for example "9 yo," "12 yo," and "14 year old." One video file name included the phrase "long fuck of 12 yo." Three of the child pornography videos, including the Tara video, depicted rape scenarios or rape fantasies. Legal pornography not involving minors also was found on defendant's computer.

Defendant testified that he is interested in rape fantasy pornography, which involves staged acts between adults without any real violence. While he had seen the terms "PTHC," "Hussyfan," and "R@ygold" in searching for pornography online, he did not know what they meant. Defendant testified he had accidentally downloaded child pornography in the past and deleted the files when he realized what they were. Generally, defendant would not read the file names of videos before he downloaded them because he had his glasses off.

With respect to the Tara video, defendant testified that, at the time he was interviewed by Officer Pierce, he had only seen it once and not all the way through. He was confused when Pierce asked if he had seen the video a half dozen times or a dozen times, which is why he falsely told Pierce he had seen it a half dozen times. Defendant said he was aware the Tara video was on his computer "at least at some point."

The jury found defendant guilty. On November 8, 2013, the court suspended imposition of sentence and placed defendant on three years' probation subject to various

_____

[3] Before trial, defendant moved unsuccessfully to exclude videos and still images depicting the child pornography found on his computer.

4

conditions, including that he serve a term of eight months in county jail. The court also ordered defendant to pay $500 in attorney fees pursuant to section 987.8 to partially reimburse the county for the cost of his public defender.

Defendant timely appealed.

## II. DISCUSSION

### A. *Evidentiary Rulings*

Defendant argues the trial court erred by admitting into evidence three pornographic videos depicting children that were found on his computer and external hard drive and still images from those videos. Defendant maintains the court likewise erred in admitting evidence of his proclivity for rape fantasy pornography. According to defendant, the videos, images, and rape fantasy evidence should have been excluded under Evidence Code section 352 as substantially more prejudicial than probative.

#### 1. *Legal Principles and Standard of Review*

A trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) For purposes of Evidence Code section 352, evidence is "prejudicial" if it " ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 (*Kipp*).) That is, " 'the statute uses the word ["prejudice"] in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) " ' "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the

5

substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

"We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*Kipp*, *supra*, 26 Cal.4th at p. 1121.) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

### 2.     *The Videos and Stills Were Properly Admitted*

Defendant was charged with violating section 311.11, subdivision (a), which makes it a felony for a "person [to] knowingly possess[] or control[] any matter . . . , the production of which involves the use of a person under 18 years of age, knowing that the matter depicts a person under 18 years of age personally engaging in or simulating sexual conduct." Thus, "the jury [was] required to determine not only whether the video[s on defendant's computer and hard drive] contained child pornography, but also whether defendant knowingly possessed or controlled the video[s] with the knowledge that [they] depicted [persons] under 18 years of age personally engaged in or simulating sexual conduct." (*People v. Holford* (2012) 203 Cal.App.4th 155, 164 (*Holford*).) At trial, defendant did not dispute the first element--that the videos found in his possession contained child pornography. Instead, he maintained he lacked the requisite knowledge that his computer contained any pornographic images, saying that while he had accidentally downloaded child pornography in the past he believed he had deleted it.

On appeal, defendant maintains the videos and stills were not probative of his knowledge of the contents of the videos on his computer. Given the inflammatory nature of that evidence, it should have been excluded, he says. Defendant further contends that even if the child pornography images had some probative value, 13 still shots were cumulative. The People counter that the sexually explicit content of the videos and stills constituted circumstantial evidence that defendant knew the material was child pornography.

6

We agree with the People that the content of the videos was relevant to prove defendant knowingly possessed child pornography. Defendant testified that he deleted any child pornography he accidentally downloaded. Had jurors not seen still images from the videos in question, they may have concluded that those videos depicted minors who defendant might reasonably have believed were older than 18 years of age. Thus, "[a]lthough the age of the girl[s] in the video[s] was not in active dispute, the video[s] [were] . . . relevant to show that this was not a situation in which defendant could have mistakenly believed a 16- or 17-year-old child actor was older than 18 years of age." (*Holford*, *supra*, 203 Cal.App.4th at p. 172, fn. 8.) Similarly, absent evidence of the videos' contents, jurors may have questioned whether defendant could reasonably have believed they did not depict sexual conduct. The videos and stills also were relevant, therefore, to show that this was not a situation in which defendant could have mistakenly believed the videos were not pornographic. For these reasons, the trial court did not abuse its discretion in determining that the videos and stills were probative of defendant's knowledge.

The child pornography images undoubtedly were disturbing. (*Holford*, *supra*, 203 Cal.App.4th at p. 171 ["child pornography is not pretty and will always be unpleasant"].) That said, given their relevance to the disputed issue of defendant's knowledge, we cannot say the trial court abused its discretion in concluding that their probative value was not substantially outweighed by a substantial danger of undue prejudice. (*Id*. at pp. 167, 171 [in possession of child pornography trial, court did not abuse its discretion under Evid. Code, § 352 by admitting entire 25-minute-long video, noting the video "*was the crime*"].)

   3.    *The Admission of Rape Fantasy Evidence Was Not Prejudicial*

Defendant also challenges the admission of evidence he enjoys rape fantasy pornography under Evidence Code section 352. That evidence, according to defendant,

7

was irrelevant to whether he knowingly possessed child pornography and was prejudicial because it painted him as a sexual deviant.

The rape fantasy evidence had at least minimal probative value as to defendant's knowledge. The Tara video, which defendant admitted is child pornography and told Officer Pierce he watched more than once, contained a rape scene. Two other child pornography videos found on defendant's hard drives also depicted rape scenarios. Evidence defendant prefers rape fantasy pornography supports the inference he knowingly saved those videos, despite the fact they featured minors, because they appealed to him.

Even assuming the trial court abused its discretion in admitting the rape fantasy evidence, that error was harmless. The admission of evidence in violation of state law, here Evidence Code section 352, is reversible only upon a showing that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) There was overwhelming evidence that defendant knew there was child pornography on his computer. He told police he watched the Tara video--which he admitted was child pornography--at least twice and as many as six times. His hard drives contained more than 10 child pornography videos, suggesting they were not downloaded because of an isolated accident or two. Evidence defendant saved two child pornography videos to an external hard drive supported the inference he knew he had them. And the videos' sexually explicit file names also support the inference he knew he was accessing child pornography. In light of that evidence, it is not reasonably probable a result more favorable to defendant would have been reached had the jury not learned about his proclivity for rape fantasy pornography.

### B.   *Probation Conditions*

Defendant challenges five of his probation conditions as facially unconstitutional. While defendant did not object to the conditions below, we nevertheless may consider his

8

facial challenges, as they "do[] not require scrutiny of individual facts and circumstances but instead require[] the review of abstract and generalized legal concepts." (*In re Sheena K.* (2007) 40 Cal.4th 875, 885.) Our review is de novo. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

### 1. *Governing Legal Principles*

"In granting probation, courts have broad discretion to impose conditions to foster rehabilitation and to protect public safety pursuant to Penal Code section 1203.1." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) Nevertheless, probation conditions may be challenged on the grounds of unconstitutional vagueness and overbreadth. (*People v. Lopez* (1998) 66 Cal.App.4th 615, 630.)

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' " (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) "A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness." (*Ibid.*)

"Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' [Citations.] Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." (*United States v. Knights* (2001) 534 U.S. 112, 119.) "[C]onditions infringing on constitutional rights . . . will pass muster if tailored to fit the individual probationer." (*In re Pedro Q.* (1989) 209 Cal.App.3d 1368, 1373.) "A restriction is unconstitutionally overbroad, on the other hand, if it (1) 'impinge[s] on constitutional rights,' and (2) is not 'tailored carefully and reasonably related to the compelling state interest in reformation and rehabilitation.' " (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.) Thus, "[t]he essential question in an overbreadth challenge is

9

the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights." (*Ibid.*)

With these principles in mind we examine each of the conditions challenged here.

### 2. *Probation Condition Requiring Waiver of Privilege Against Self-incrimination*

Condition No. 2 of defendant's probation requires that he "waive any privilege against self-incrimination and participate in polygraph examinations, which shall be part of the sex offender management program, pursuant to Section 1203.067(b)(3) of the Penal Code." That probation condition is statutorily mandated for any person placed on formal probation on or after July 1, 2012, for any offense requiring registration under sections 290 through 290.023. (§ 1203.067, subd. (b)(3).) Defendant raises an overbreadth challenge to the condition, saying it unnecessarily infringes on his Fifth Amendment rights. He asserts the condition should be modified to require him to answer only those questions that are reasonably related to the completion of his treatment program and only under circumstances where doing so would not interfere with his Fifth Amendment privilege against self-incrimination.[4]

The People respond that the condition will never violate defendant's Fifth Amendment rights because it merely allows the state to compel him to answer incriminating questions, not to use those statements against him in a criminal proceeding. According to the People, "[a]ny statements that appellant makes under the compulsion of

---

[4] The issue of whether a probation condition imposed pursuant to section 1203.067, subdivision (b)(3) requiring a defendant waive his or her Fifth Amendment privilege against self-incrimination and participate in polygraph examinations is unconstitutional is currently under review by the California Supreme Court. (*People v. Garcia* (2014) 224 Cal.App.4th 1283, review granted July 16, 2014, S218197; *People v. Klatt* (2014) 225 Cal.App.4th 906, review granted July 16, 2014, S218755; *People v. Friday* (2014) 225 Cal.App.4th 8, review granted July 16, 2014, S218288.)

10

this condition will be subject to the penalty exception" and "will not be permitted to be used against appellant in a criminal proceeding."

"The Fifth Amendment, in relevant part, provides that no person 'shall be compelled in any criminal case to be a witness against himself.' " (*Minnesota v. Murphy* (1984) 465 U.S. 420, 426 (*Murphy*).) A probationer retains this right. (*Ibid.*)

As our Supreme Court recently explained, "the Fifth Amendment does not provide a privilege against the compelled 'disclosure' of self-incriminating materials or information, but only precludes the use of such evidence in a criminal prosecution against the person from whom it was compelled." (*Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1134.) Thus, "a State may validly insist [that probationers answer] even incriminating questions . . . as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." (*Murphy*, *supra*, 465 U.S. at p. 436, fn. 7.) Put differently, "incriminating answers may be officially compelled, without violating the privilege, when the person to be examined receives immunity 'coextensive with the scope of the privilege'--i.e., immunity against both direct and 'derivative' criminal use of the statements." (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 714-715.)

Ordinarily, a witness "must assert the privilege rather than answer if he desires not to incriminate himself. . . . [I]f he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." (*Murphy*, *supra*, 465 U.S. at p. 429.) This "general rule that the Fifth Amendment privilege is not self-executing" has been deemed inapplicable in "so-called 'penalty' cases" "where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony.' " (*Id.* at p. 434.) For example, in *Garrity v. New Jersey* (1967) 385 U.S. 493, "the Court held that an individual threatened with discharge from employment for exercising the privilege had not waived it by responding to questions rather than standing on his right to

remain silent." (*Murphy*, *supra*, at pp. 434-435.)  In *Murphy*, the Supreme Court stated that a "classic penalty situation" would exist "if the State, either expressly or by implication, asserts that invocation of the [Fifth Amendment] privilege [by a probationer in response to questions put to him or her] would lead to revocation of probation."  (*Id.* at p. 435.)  Under those circumstances, a probationer's "failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution."  (*Ibid.*)

The People and the dissent take the position that any incriminating statements defendant may make will be deemed compelled under *Murphy* and will not be available for use at a criminal prosecution.  We disagree with their reading of the probation condition, and the view of Fifth Amendment jurisprudence on which it is based, in two regards.  First, as discussed above, the Fifth Amendment does not prohibit the state from requiring a probationer to answer questions in the course of probation, provided the state does not use any incriminating answers in a separate criminal proceeding against the probationer.  Thus, if the state's only goal is to compel the disclosure of self-incriminating information, no Fifth Amendment waiver is necessary.  Accordingly, the only rational reading of the very broad waiver at issue--of "*any* privilege against self-incrimination"--is as a complete waiver of immunity under the Fifth Amendment.  The plain language of the waiver, if left intact, would therefore allow the state to use defendant's compelled statements against him in a separate criminal proceeding.  Second, *Murphy* does not render compelled Fifth Amendment waivers constitutional.  (*Murphy*, *supra*, 465 U.S. at p. 438 ["the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege"].)  The penalty exception referred to in that case merely remedies the Fifth Amendment violation by applying the exclusionary rule to make the compelled statements inadmissible.

In our view, United States Supreme Court precedent makes clear that a compelled waiver of the privilege against self-incrimination violates the Fifth Amendment at the

12

time the waiver is compelled. (*Murphy*, *supra*, 465 U.S. at p. 438 ["the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege"].) Because the waiver of the privilege against self-incrimination infringes a probationer's constitutional rights, it must be "closely tailor[ed]" to its purposes to survive an overbreadth challenge. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) The instant waiver is not.

Public safety is "a primary goal" of court-ordered probation conditions. (§ 1202.7; *People v. Olguin* (2008) 45 Cal.4th 375, 379.) A waiver of the privilege against self-incrimination would further public safety by allowing the state to identify the most dangerous probationers and focus its resources on monitoring and treating those individuals.[5] But the broad waiver at issue here is not tailored to that purpose, as it encompasses a complete waiver of Fifth Amendment immunity and applies regardless of the topic or the time frame of defendant's statements. Under this broad waiver, a probationer could be compelled to confess to a crime committed long ago and having no relevance to his status as a sex offender.

The People argue that the waiver can be construed narrowly as limited to the probationer's participation in the sex offender management program to avoid doubts as to its constitutionality. In our view, that narrowing construction is insufficient to render the statutorily-required waiver constitutional for two reasons. First, the waiver gives the state

---

[5] That said, we see no overwhelming need for a compelled waiver of defendant's fundamental right to his privilege against self-incrimination to achieve this purpose. As discussed above, the Fifth Amendment already allows the state to require a probationer to participate in treatment and answer questions truthfully. (*Murphy*, *supra*, 465 U.S. at p. 427.) If the probationer does not invoke the privilege against self-incrimination, the privilege is waived voluntarily. If the probationer claims the privilege against self-incrimination, and the state continues to compel incriminating statements from him, then he retains immunity from the use and derivative use of his statements in any separate criminal proceeding against him. (*Id.* at p. 435.) In any event, the state can get the information it seeks without a waiver.

carte blanche to use a probationer's statements against the probationer with no regard for the level of the threat he or she may pose to public safety. (§§ 290, subd. (c), 314 [statutorily-required waiver applies to probationers convicted of a broad swath of sex offenses ranging from indecent exposure to rape].) The waiver applies with equal force to the most dangerous offenders and the least dangerous. Second, the waiver allows for use of a probationer's statements in the prosecution of *any* offense--such as minor drug offenses[6]--with no consideration for the extent to which public safety is compromised.

We conclude that the section 1203.067 requirement of a waiver of "any privilege against self-incrimination" as a condition of probation is unconstitutionally overbroad with respect to defendant's rights under the Fifth Amendment and must be stricken.[7]

As noted, defendant also contends the condition is overbroad because the scope of the polygraph examination questions is not limited to those reasonably related to the completion of his treatment program. Under *People v. Lent* (1975) 15 Cal.3d 481, 486, "a condition of probation which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality." The requirement that defendant participate in polygraph examinations is valid under *Lent* if the questions posed to him are reasonably related to his successful completion of the sex offender management program and the crime of which he was convicted. (See *Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 321 [under *Lent,* "the order imposing a polygraph condition must limit the questions

_____

[6] California Sex Offender Management Board-promulgated standards specifically advise polygraph examiners to inquire about the use of drugs, among other illegal conduct. (Cal. Sex Offender Management Bd., Post–Conviction Sex Offender Polygraph Standards at p. 21, available online at <http://www.casomb.org/docs/Polygraph_Standards_FINAL.PDF> as of Oct. 6, 2015.)

[7] Defendant suggests the condition may be modified to pass constitutional muster. We decline to order any modifications. Because the probation condition is mandated by statute, it is not the proper role of this court to fashion modifications that have no basis in the plain language of the statute; these are questions better left to the Legislature.

allowed to those relating to the successful completion of the stalking therapy program and the crime of which Brown was convicted"].)

Section 1203.067, subdivision (b)(3) mandates that participation in polygraph examinations "shall be part of the sex offender management program." In view of that language, we construe the probation condition's requirement of participation in polygraph examinations as allowing only questions relating to the successful completion of the sex offender management program and the crime of which defendant was convicted. So construed, we uphold condition No. 2, as modified, as sufficiently narrow to satisfy the overbreadth requirements of *Lent*.

### 3. *Probation Condition Requiring Waiver of Psychotherapist-PatientPrivilege*

Condition No. 3 of defendant's probation requires him to "waive any psychotherapist-patient privilege to enable communication between the sex offender management professional and the Probation Officer, pursuant to Section 1203.067(b)(4) and Section 290.09 of the Penal Code." That probation condition is statutorily mandated for any person placed on formal probation on or after July 1, 2012, for any offense requiring registration under sections 290 through 290.023. (§ 1203.067, subd. (b)(4).) Defendant contends this condition is constitutionally overbroad because it burdens his right to privacy without being narrowly tailored to any legitimate state interest. He requests that this court strike the condition or, in the alternative, modify it to limit disclosure to the probation officer and the court.[8]

_____

[8] The issue of whether a probation condition imposed pursuant to section 1203.067, subdivision (b)(4) requiring a defendant waive his or her psychotherapist-patient privilege is unconstitutional is currently under review by the California Supreme Court. (*People v. Garcia* (2014) 224 Cal.App.4th 1283, review granted July 16, 2014, S218197; *People v. Klatt* (2014) 225 Cal.App.4th 906, review granted July 16, 2014, S218755; *People v. Friday* (2014) 225 Cal.App.4th 8, review granted July 16, 2014, S218288.)

15

"The psychotherapist-patient privilege has been recognized as an aspect of the patient's constitutional right to privacy. [Citations.] It is also well established, however, that the right to privacy is not absolute, but may yield in the furtherance of compelling state interests." (*People v. Stritzinger* (1983) 34 Cal.3d 505, 511.) The Legislature has explained that the purpose of the waiver of the psychotherapist-patient privilege is to "enable communication between the sex offender management professional and supervising probation officer." (§ 1203.067, subd. (b)(4).) Such communication is an important part of the sex offender management program all sex offenders placed on formal probation on or after July 1, 2012, are statutorily mandated to complete. (§§ 1203.067, subd. (b)(2), 290.09, subd. (c) [sex offender management professional must communicate with the probation officer about the probationer's "progress in the program and dynamic risk assessment issues"].) Thus, we find that the state's interest in furthering such communication is legitimate and substantial and the psychotherapist-patient privilege waiver supports the compelling state interest in "enhanc[ing] public safety and reduc[ing] the risk of recidivism posed by [sex] offenders." (§ 290.03, subd. (a).)

The question remains, however, whether the scope of the probation condition is properly tailored to the state's interest. The condition contains broad language, requiring the waiver of "*any* psychotherapist-patient privilege," regardless of the subject matter of the communication or the level of risk to public safety absent disclosure. But, unlike the language of the waiver of the privilege against self-incrimination, this broad language is followed by the phrase "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." This additional language limits what may be done with the probationer's communications once they are revealed.

We will therefore narrowly construe the statute as requiring a waiver of the psychotherapist-patient privilege only insofar as it is necessary "to enable communication

16

between the sex offender management professional and supervising probation officer . . . ." (§ 1203.067, subd. (b)(4).) Specifically, we hold that defendant may constitutionally be required to waive the psychotherapist-patient privilege only to the extent necessary to allow the sex offender management professional to communicate with the supervising probation officer. Furthermore, the supervising probation officer may communicate defendant's scores on the state-authorized risk assessment tool for sex offenders (both the "dynamic tool" and the "future violence tool") to the Department of Justice to be made accessible to law enforcement as required under section 290.09, subdivision (b)(2). (§§ 290.04, 290.09, subd. (b)(2).) This narrow interpretation of the statute allows the psychotherapist to communicate with the probation officer as necessary, furthering the purposes of the exception as set forth in the statute. Apart from these exceptions, neither the psychotherapist nor the probation officer may relay protected communications to some other third party under the waiver, and defendant's privacy rights based on the psychotherapist-patient privilege otherwise remain intact.

### 4. *Probation Condition Prohibiting Possession of Pornographic or Sexually Explicit Material*

Probation condition No. 15 provides that "defendant shall not purchase or possess any pornographic or sexually explicit material as defined by the probation officer." Defendant maintains this condition is unconstitutionally vague because it lacks an express knowledge requirement. We agree.

As defendant notes, courts have consistently ordered modification of probation conditions to incorporate a scienter requirement where a probationer could unknowingly engage in the prohibited activity. (*In re Victor L.* (2010) 182 Cal.App.4th 902, 912-913 [modifying probation condition to prohibit knowing presence of weapons or ammunition]; *In re Justin S.* (2001) 93 Cal.App.4th 811, 816 [modifying prohibition on association with gang members to prohibit association with known gang members]; *In re Kacy S.* (1998) 68 Cal.App.4th 704, 713 [modifying probation condition that defendant

17

not associate with any persons not approved by his probation officer].)  Without an express knowledge requirement, defendant could unwittingly violate probation condition No. 15.  For example, another person could leave pornographic or sexually explicit material in defendant's car or house without his knowledge.  Or he could pick up a book or a magazine without knowing it contains prohibited material.  To enforce a probation violation for unknowing possession of the prohibited materials would violate the principles set forth in *In re Sheena K.*  Therefore, we shall order the trial court to modify this probation condition to prohibit knowing possession or purchase of pornographic or sexually explicit material.

### 5. *Probation Condition Prohibiting Possession of Data Encryption Technique Programs*

Probation condition No. 17 provides, in relevant part, "defendant shall not possess or use any data encryption technique program."  Defendant's vagueness challenge to that condition mirrors his objection to probation condition No. 15.  According to defendant, he could violate this condition unwittingly.

We agree that defendant could unknowingly possess or use a data encryption technique program, particularly given that data encryption is ubiquitous in modern computer technology.  Accordingly, we shall order the trial court to modify this probation condition to prohibit knowing possession or use of a data encryption technique program.

### 6. *Probation Condition Barring Defendant From Frequenting Any Business Where Pornographic Materials Are Openly Exhibited*

Defendant next challenges condition No. 16 of his probation, which provides he "shall not frequent, be employed by, or engage in, any business where pornographic materials are openly exhibited."  Defendant asserts the term "frequent" and the absence of a scienter requirement render the condition unconstitutionally vague.  He requests that the condition be modified to state he "shall not visit or remain in any business where you

know or which your probation officer informs you is a place where pornographic materials are openly exhibited."

We agree with defendant that the term "frequent" is unconstitutionally vague, as this court has previously held.  (*People v. Leon* (2010) 181 Cal.App.4th 943, 952 [term "frequent" is unconstitutionally vague]; *In re H.C.* (2009) 175 Cal.App.4th 1067, 1072 [term "frequent" is obscure and susceptible to multiple meanings].)  Consistent with this court's modification of the term in *Leon*, we shall order the trial court to substitute the phrase "visit or remain in" for the term "frequent" in probation condition No. 16. Furthermore, because defendant could unknowingly visit a business where prohibited materials are openly exhibited, we will order the trial court to incorporate a scienter requirement into the condition.

### C.     *Ability to Pay Attorney Fees*

Finally, defendant contends there is insufficient evidence in the record to support his ability to pay $500 to partially reimburse the county for the cost of his public defender, an objection he raised below.

### 1.     *Governing Legal Principles*

Section 987.8 empowers the court to order a defendant who has received legal assistance at public expense to reimburse some or all of the county's costs.  (§ 987.8, subd. (b).)  A court may order the payment of attorney fees pursuant to that provision only if it determines after a hearing that the defendant has the ability to pay.  (*Id.*, subds. (b), (e).)  Such a finding must be supported by substantial evidence.  (*People v. Nilsen* (1988) 199 Cal.App.3d 344, 347; *People v. Verduzco* (2012) 210 Cal.App.4th 1406, 1421.)

In the context of section 987.8, "ability to pay" means "the overall capability of the defendant to reimburse the costs, or a portion of the costs, of the legal assistance provided to him or her, and shall include, but not be limited to, all of the following: [¶] (A) The defendant's present financial position. [¶] (B) The defendant's reasonably

19

discernible future financial position. In no event shall the court consider a period of more than six months from the date of the hearing for purposes of determining the defendant's reasonably discernible future financial position. Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense. [¶] (C) The likelihood that the defendant shall be able to obtain employment within a six-month period from the date of the hearing. [¶] (D) Any other factor or factors which may bear upon the defendant's financial capability to reimburse the county for the costs of the legal assistance provided to the defendant." (§ 987.8, subd. (g)(2).)

### 2. *Analysis*

According to the probation report, defendant worked as a manager at a Chili's restaurant between 2006 and his arrest in March 2012 at a salary of $54,000 per year. Between 1992 and 2003, he was a manager at another restaurant and earned $65,000 a year. Defendant lived in his mother's mobile home, was divorced, and had no children. He was placed on probation and ordered to serve a term of eight months in county jail with credit for 76 days served.

The People argue evidence of defendant's past income and that he lived with his mother and had no family to support are sufficient to support the $500 attorney fees order. We disagree. That defendant had a well-paying job 20 months prior to sentencing says nothing about his "present financial position," absent evidence of his assets, savings, or expenses. (§ 987.8, subd. (g)(2)(A).) And the fact that he was to serve time in county jail indicates he would have limited financial and employment opportunities during the relevant six-month period. (*Id*., subd. (g)(2)(B) & (C).) While defendant is to be released within that six-month period, there is nothing in the record to suggest he will find employment quickly, particularly given his status as a convicted sex offender.

We conclude there was insufficient evidence of defendant's present ability to pay $500 in attorney fees to support the trial court's section 987.8 order. We shall remand the

20

matter to the trial court for a new determination of defendant's present ability to pay attorney fees. (See *People v. Viray* (2005) 134 Cal.App.4th 1186, 1217 [remanding for a determination of the defendant's ability to pay].)

## III.    DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with instructions (1) to vacate its attorney fee order and to conduct a further hearing on the defendant's ability to pay attorney fees; (2) to strike from probation condition No. 2 the language "waive any privilege against self-incrimination and"; (3) to modify probation condition No. 15 to state that defendant "shall not knowingly purchase nor possess any pornographic or sexually explicit material, as defined by his probation officer"; (4) to modify probation condition No. 17 to state that "defendant shall not knowingly possess or use any data encryption technique program"; and (5) to modify probation condition No. 16 to state "defendant shall not knowingly visit or remain in, be employed by, or engage in, any business where pornographic materials are openly exhibited."

_____

Walsh, J.[*]



I CONCUR:




_____

Rushing, P.J.



_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

ELIA, J., Dissenting

I respectfully disagree with the majority's conclusion that the probation condition requiring defendant to waive the privilege against self incrimination (Pen. Code, § 1203.067, subd. (b)(3))[1] is prohibited by the Fifth Amendment to the United States Constitution under *Minnesota v. Murphy* (1984) 465 U.S. 420 (*Murphy*), and that therefore this court must strike the condition. (Maj. opn. at p. 14.) In addition, I would not construe the waiver of the psychotherapist-patient waiver as narrowly as does the majority. (*Id.* at pp. 16-17.)

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." However, the Fifth Amendment does not prohibit a state from requiring a prospective probationer to choose between accepting this waiver and going to prison. This is true because the probation condition requiring defendant to waive the privilege against self incrimination does not *itself* compel a probationer to be a witness against himself in *a criminal proceeding*. This condition requires only that the probationer provide *full disclosures* in connection with the sex offender management program. Such disclosures are necessary to the success of the program. The waiver provision is critical because it prevents a probationer from refusing to provide such disclosures on self-incrimination grounds.

In *Murphy*, *supra*, 465 U.S. 420, Murphy had been placed on probation for a sexual offense. His probation terms required him to participate in a sex offender treatment program and to be "truthful with the probation officer 'in all matters.' " (*Id.* at p. 422.) A counselor in the treatment program told the probation officer that Murphy had admitted an unrelated rape and murder. (*Id.* at p. 423.) The probation officer confronted Murphy about these admissions. (*Id.* at pp. 423-424.) Again, Murphy admitted the rape and murder. (*Id.* at p. 424.) Thereafter, Murphy was charged with murder, and he sought

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

to suppress his admissions to the probation officer on Fifth Amendment grounds. (*Murphy*, *supra*, at pp. 424-425.) The Minnesota Supreme Court held that, because the defendant was required to respond truthfully to the probation officer, the probation officer was required to inform the defendant of his Fifth Amendment rights before questioning him, and her failure to do so merited suppression of his admissions. (*Murphy*, *supra*, at p. 425.)

The United States Supreme Court granted certiorari to decide "whether a statement made by a probationer to his probation officer without prior warnings is admissible in a subsequent criminal proceeding." (*Murphy*, *supra*, 465 U.S. at p. 425.) The Supreme Court concluded that the "general rule" is that the Fifth Amendment privilege against self-incrimination is not "self-executing." (*Murphy*, *supra*, at p. 434.) A privilege that is not "self-executing" applies only where it has been invoked. (*Ibid*.) Murphy had not invoked the privilege because he did not "assert the privilege rather than answer" the probation officer's questions. (*Id*. at p. 429.) The court rejected Murphy's claim that his obligation under the terms of his probation to truthfully answer his probation officer's questions alone converted his "otherwise voluntary" responses into compelled statements. (*Id*. at p. 427.) Analogizing Murphy's situation to that of a subpoenaed witness who testifies on pain of contempt, the court observed that "[t]he answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege." (*Ibid*.) "If he asserts the privilege, he 'may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him' in a subsequent criminal proceeding. [Citation.] But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." (*Id*. at p. 429.)

3

In *Murphy*, the United States Supreme Court considered the applicability of the "penalty exception" to the general rule that the Fifth Amendment is not "self-executing." The penalty exception applies where the State not only compelled the person's statements but also "sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' " (*Murphy*, *supra*, 465 U.S. at p. 434.) "A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." (*Id*. at p. 435.) Yet even in the "classic penalty situation," the probationer's compelled statements would still be admissible in a probation revocation hearing, as that is not a criminal proceeding and the Fifth Amendment is therefore inapplicable. (*Murphy*, *supra*, at p. 435, fn. 7.) Murphy's statements did not fall within the penalty exception. "On its face, Murphy's probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." (*Id*. at p. 437.) Hence, his statements to the probation officer were admissible against him in a criminal prosecution.

In *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112 (*Maldonado*), the California Supreme Court rejected the defendant's claim that the Fifth Amendment provided "a guarantee against officially compelled *disclosure* of potentially self-

4

incriminating information." (*Maldonado*, *supra*, at p. 1127.)  The *Maldonado* court based its holding on the rule that the Fifth Amendment applies only to *use* of a defendant's incriminating statements; the Fifth Amendment does not bar the government from compelling those statements.  "[T]he Fifth Amendment does not provide a privilege against the compelled 'disclosure' of self-incriminating materials or information, but only precludes the use of such evidence in a criminal prosecution against the person from whom it was compelled." (*Maldonado*, *supra*, at p. 1134.)  "[T]he Fifth Amendment privilege against self-incrimination does not target the mere compelled *disclosure* of privileged information, but the ultimate *use* of any such disclosure in aid of a criminal prosecution against the person from whom such information was elicited." (*Id*. at p. 1137.)

The California Supreme Court's decision in *Maldonado* relied on the United States Supreme Court's decision in *Chavez v. Martinez* (2003) 538 U.S. 760 (*Chavez*). *Chavez* was a civil action involving qualified immunity in which the issue was whether a police officer who allegedly compelled statements from the plaintiff could be held liable for violating the plaintiff's civil rights.  The plaintiff claimed that the police officer had violated the Fifth Amendment.  The United States Supreme Court produced a plurality opinion and multiple separate opinions rejecting the plaintiff's theory.  Justice Thomas wrote the lead opinion.  In a section of his opinion joined by three other justices, Justice Thomas stated that compelled statements "of course may not be used against a defendant at trial, [citation], but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs." (*Chavez*, *supra*, at p. 767 (plur. opn. of Thomas, J.).) "[M]ere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness." (*Id*. at p. 769 (plur. opn. of Thomas, J.).)  Writing separately, Justice Souter acknowledged that it would be "well outside the core of Fifth Amendment protection" to find that "questioning alone" was a "completed violation" of the Fifth Amendment and declined to extend the Fifth

Amendment to such a claim. (*Chavez*, *supra*, at p. 777 (conc. opn. of Souter, J.).) Thus, in *Chavez*, five justices held that the Fifth Amendment is not violated by the extraction of compelled statements.

As applied to this case, *Murphy* establishes that defendant's Fifth Amendment rights are not violated by the probation condition requiring him to waive the privilege against self-incrimination as to questions asked during the sex offender management program. The state has, "by implication, assert[ed] that invocation of the privilege" in response to such incriminating questions "would lead to revocation" of probation. (See *Murphy*, *supra*, 465 U.S. at p. 435.) Thus, if defendant makes any statements in response to questions posed to him during the sex offender management program, those statements will be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution. (*Murphy*, *supra*, at p. 435.) In short, since such statements will necessarily fall within the penalty exception, they will not be available for use at a criminal prosecution, and defendant's Fifth Amendment rights have not been violated. (See *Chavez*, *supra*, 538 U.S. at p. 769 (plur. opn. of Thomas, J.).) [the Fifth Amendment is not violated absent use of the compelled statements in a criminal case against the witness]; *Chavez*, *supra*, at p. 777 (conc. opn. of Souter, J.).)

In sum, I believe that we are bound by the holdings of *Maldonado* and *Chavez* (see *Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455), that the mere extraction of compelled statements does not violate the Fifth Amendment. Since the challenged probation condition does not purport to authorize the *use* of any statements against defendant in a criminal proceeding, it does not violate the Fifth Amendment.

Simply put, because the penalty exception will necessarily apply to statements that defendant makes in response to questions asked as part of the sex offender management program under compulsion of section 1203.067, subdivision (b)(3) probation condition, the condition itself does not violate the Fifth Amendment.

6

As to the waiver of the psychotherapist-patient privilege, in the Sex Offender Punishment Control and Containment Act of 2006 (§ 290.03), the "Legislature [found] and declare[d] that a comprehensive system of risk assessment, supervision, monitoring and containment for registered sex offenders residing in California communities is necessary to enhance public safety and reduce the risk of recidivism posed by [sex] offenders." (§ 290.03, subd. (a).)

Accordingly, the Legislature amended section 1203.067 to provide a collaborative approach to sex offender management known as the "Containment Model." As the analysis of Assembly Bill No.1844 explains, "The Containment Model calls for a collaborative effort of sex offender specific treatment providers, law enforcement supervising agents such as probation officers or parole agents, polygraphists providing specialized testing as both a treatment and monitoring tool and victim advocacy participants whenever possible. The offender is supervised and overseen within this context." (Sen. Com. on Public Safety, Bill Analysis of Assem. Bill No. 1844 (2009-2010 Reg. Sess.) June 29, 2010, available on line at http://www.leginfo.ca.gov/pub/09-10/bill/asm/ab_1801-1850/ab_1844_cfa_20100628_141315_sen_comm.html.) As of July 1, 2012, the Containment Model is mandatory. (§§ 290.09, 1203.067, 3008, 9003.)

The Legislature has explained that the purpose of the waiver of the psychotherapist-patient privilege is to "enable communication between the sex offender management professional and supervising probation officer." (§ 1203.067, subd. (b)(4).) Such a waiver supports the compelling state interest in "enhanc[ing] public safety and reduc[ing] the risk of recidivism posed by [sex] offenders." (§ 290.03, subd. (a).)

Since the Containment Model calls for a collaborative effort of sex offender specific treatment providers, which includes polygraphists providing specialized testing as both a treatment and monitoring tool, limiting disclosures to the probation officer would effectively eliminate such a treatment and monitoring tool. The substance of the

7

psychotherapist-patient communications may require verification or investigation by the polygraphists.

In other words, for the Containment Model of sex offender management to be effective, there must be open and ongoing communication between *all* professionals responsible for supervising, assessing, evaluating, treating, supporting, and monitoring sex offenders. The absence of open and ongoing communication between these professionals and other involved persons could compromise the purpose and efficacy of the containment team approach and as a result jeopardize the safety of the community. Accordingly, I would not construe the waiver of the psychotherapist-patient waiver as narrowly as does the majority.

_____

ELIA, J.